**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>PAUL RIESSELMAN,<br><br>    Defendant. | No. CR09-4061-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE** |

      On January 28, 2010, the grand jury returned a Superseding Indictment against the defendant Paul Riesselman charging him in Count 1 with conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 960(a); in Count 2 with distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(C), and 860(a); in Count 3 with being an unlawful user of methamphetamine in possession of firearms in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); and in Count 4 with unlawfully possessing an unregistered sawed-off shotgun in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871. (Doc. No. 18) On March 1, 2010, Riesselman filed a motion to suppress evidence obtained and arising from a search of his residence and his person on July 9, 2008. (Doc. No. 28) The plaintiff (the "Government") filed a resistance to the motion. (Doc. No. 30).

      The Trial Management Order assigned motions to suppress to the undersigned for appropriate disposition. (Doc. No. 7, § IV.A.) The undersigned held a hearing on the motion on March 10, 2010, at which Assistant United States Attorney Kevin Fletcher appeared on behalf of the Government, and Riesselman appeared with his attorney Jim McGough. The Government offered the testimony of Tri-State Drug Task Force Officer Darin J. Heideman, and Special Agent Todd Gordon Jones of the Iowa Division of

Narcotics Enforcement. Riesselman testified on his own behalf, and he also offered the testimony of his mother, Jane Pagel.

The following exhibits were admitted into evidence: **Gov't Ex. 1**, Search Warrant issued by the undersigned on July 3, 2008, with attached Return made before the undersigned on July 10, 2008, and four-page inventory of items seized during the search of Riesselman's residence (Doc. No. 30-1); **Gov't Ex. 2**, Attachment 1 to the search warrant (Doc. No. 30-2); **Gov't Ex. 3**, Application for Search Warrant (Doc. No. 30-3); **Gov't Ex. 4**, Affidavit of Darin Heideman in support of the application for search warrant (Doc. No. 30-4); **Gov't Ex. 5**, Iowa DNE Rights Advisory Form signed by Riesselman on July 9, 2008 (Doc. No. 30-5); **Gov't Ex. 6A**, a CD containing an audio recording of a portion of officers' interview of Riesselman on July 9, 2008; **Gov't Ex. 6B**, a transcript of the audio recording contained in Gov't Ex. 6A (Doc. No. 34); and **Gov't Ex. 7**, a copy of a photograph of Riesselman's cell phone and an inventory sheet left on Riesselman's kitchen table when officers had finished their search of the residence on July 9, 2008 (Doc. No. 35).

## *BACKGROUND FACTS*

The following background facts are taken from the Affidavit in support of the search warrant[*] (Gov't Ex. 4) and the testimony at the hearing. In mid-March 2008, a confidential informant ("CI") met with SA Jones and provided information indicating the CI had purchased methamphetamine from Riesselman over a period of time. The CI stated Riesselman conducted drug transactions in the basement of his residence, and he had surveillance cameras and weapons at the residence. Over the next three to four months, the CI met with Riesselman at Riesselman's residence on numerous occasions during which

---

[*]The affidavit was deemed to provide probable cause for issuance of the search warrant, and Riesselman does not contest the adequacy of the warrant itself. Rather, as discussed more fully in this opinion, he objects to the manner in which the warrant was executed.

the CI and Riesselman discussed methamphetamine transactions and weapons. On one occasion, the CI purchased a small quantity of methamphetamine from Riesselman. The details of the encounters between the CI and Riesselman are set forth in the affidavit (Gov't Ex. 4). Among other things, the CI had provided information that gang members had been seen at Riesselman's home, and Riesselman had acquired a .308 assault rifle.

Because SA Jones is not a federally-deputized officer, he asked TFO Heideman to assist him in obtaining a federal warrant to search Riesselman's residence. Heideman prepared an affidavit (Gov't Ex. 4) and application for search warrant (Gov't Ex. 3), and presented them to the undersigned on July 3, 2008. Based on the information contained in the affidavit, the undersigned found probable cause to issue the search warrant, and the warrant was issued. (Gov't Ex. 1) Because Riesselman was known to have surveillance cameras and weapons at his residence, including an assault rifle, and gang members had been observed at his residence, the warrant was a "no-knock warrant," allowing officers to breach and enter the residence without knocking and announcing themselves first. In addition, the warrant was authorized to be executed at any time of the day or night. (*See* Gov't Ex. 1)

The search warrant form contains spaces for the court to designate whether a person, a designated premises, or both will be the subject of the search. The Government requested authority to search premises designated as Riesselman's residence, garage, "and any other outbuildings, garbage containers, and/or vehicles parked on the property[.]" (Gov't Ex. 1) The Government did not request, and the court did not authorize, the search of any persons. (*Id.*) In the space on the search warrant form for the designation of the items for which officers were authorized to search, the form indicates, "See attachment 1." (*Id.*) The court routinely permits warrants and affidavits to refer to attachments, and deems the warrant itself to include both the Search Warrant form (Gov't Ex. 1) and the attachment (Gov't Ex. 2). *See United States v Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006)

3

("an affidavit may provide the necessary particularity for a warrant if it is either incorporated into or attached to the warrant") (internal quotation marks, citations omitted); *cf. United States v. Hamilton*, 591 F.3d 1017, 1028-29 (8th Cir. 2010). Attachment 1 lists numerous documents, items of drug paraphernalia, weapons, and other items for which officers were authorized to search pursuant to the warrant. (*See* Gov't Ex. 2)

On July 9, 2008, at about 9:00 a.m., Heideman met with Jones and a number of other officers in Crawford County, Iowa, for a briefing prior to execution of the search warrant. Heideman provided Jones with copies of the warrant, including Attachment 1, and Heideman's affidavit in support of the warrant application. Jones briefed the officers about the case, and a member of the Iowa State Patrol Tactical Unit gave the tactical side of the briefing. The Tactical Unit members were to conduct the entry into the residence while the non-tactical officers secured the perimeter and apprehended anyone who might attempt to flee from the premises. Jones assigned Heideman to interview Riesselman, but Jones also planned to question Riesselman himself. The officers intended to ask Riesselman about the activities detailed in the warrant affidavit, such as his drug usage, drug trafficking activities, association with gang members, and weapons. They also planned to see if Riesselman was interested in cooperating with law enforcement in a further investigation.

When the team arrived at Riesselman's residence, the Tactical Unit approached the house and set off two diversionary devices. They secured a female subject, Stephanie Adams, who was inside the residence. Some of the non-tactical officers encountered Riesselman and another individual, George Wayland, outside the rear of the residence. They secured and handcuffed Riesselman and Wayland. As Jones entered the area and began to approach Riesselman, one of the other officers approached Jones and told him a small personal-use quantity of methamphetamine had been found in Riesselman's pocket during a pat-down search. Jones took possession of the drugs and approached Riesselman,

who was sitting on the ground with his hands cuffed behind his back. Jones read Riesselman his *Miranda* rights from a card Jones carries with him. Riesselman indicated he understood his rights and he was willing to talk with the officers. Jones directed Riesselman to "sit tight" for a minute, and then Jones asked Heideman to take Riesselman inside the residence and interview him while Jones talked with Wayland and Adams.

Heideman took Riesselman inside and the two sat at the kitchen table. Riesselman testified that as they were walking into the residence, he asked, "Should I have an attorney present?" and Heideman said they were "just talking," and if Riesselman talked with him, then he could tell the prosecutor that Riesselman had cooperated. Heideman has no memory of this conversation and made no notes about it in his written notes of the interview; however, he testified it was possible that the conversation occurred. Jones also has no memory of Riesselman ever asking for a lawyer at any time.

Although neither officer remembers what occurred with regard to Riesselman's handcuffs, either the handcuffs were removed or his hands were repositioned in front of him because he was able to write and use his hands while he was seated at the table. He was not formally placed under arrest, and there was no plan to arrest him that day, although he was detained while the search of the residence was conducted. Heideman produced a written Rights Advisory Form (Gov't Ex. 5), which he placed on the table in front of Riesselman. Heideman read each of the paragraphs on the form to Riesselman, and then indicated that if Riesselman understood his rights, he should initial the form next to each of the paragraphs, and sign the form at the bottom. Riesselman executed the form at 9:25 a.m. Heideman then asked Riesselman about his drug usage, his work history, and questions about some of the weapons that were present in the residence. No one else was present with Heideman and Riesselman at the time the interview began. Heideman did not have a recording device with him, so the first part of the interview is not recorded. He talked with Riesselman for approximately thirty to forty-five minutes before Jones came

in and joined them. Jones had a recording device with him, and the remainder of the interview, about an hour-and-a-half, was recorded. (*See* Gov't Exs. 6A & 6B)

Jones asked Riesselman some questions about his drug history, people he had bought drugs from and sold drugs to, financial transactions related to drug sales, and the like. When he was finished questioning Riesselman, at about 11:30 a.m., Riesselman was released and allowed to leave the premises. Jones gave Riesselman a copy of the warrant (Gov't Ex. 1). Jones thinks there was more than one page to the document he gave to Riesselman, but he does not specifically recall if Attachment 1 was with the face page of the search warrant. Riesselman testified that all he was given was the first page of Gov't Ex. 1, the face page of the Search Warrant. He stated that when he left the residence, his mother was there, and he told her that he did not understand what the officers were looking for. He noted that the search warrant referred to an "Attachment 1," but there was nothing attached to the page Jones had given him. Riesselman's mother also testified there was only one page to the document. The court finds Riesselman's and his mother's testimony to be credible, and therefore finds Riesselman only received the first page of the search warrant, and not Attachment 1.

When the officers finished the search and left the residence, Jones left Riesselman's cell phone and a copy of the inventory on the kitchen table. He photographed the items to show what had been left. (Gov't Ex. 7)

## DISCUSSION

Riesselman raises several issues in his motion. He argues the search of his person was not authorized by the search warrant and was unlawful. He claims his statement to the officers arose from the discovery of the drugs in his pocket that occurred during the illegal search of his person. He argues he asserted his right to counsel, yet the officers continued to question him. And he claims execution of the warrant was unlawful because

the officers failed to give him a complete copy of the warrant that included a list of items for which they were authorized to search. The court will address each of these issues below.

### A.     *Search of Riesselman's person*

The first issue Riesselman raises is easy to resolve. Riesselman argues the search of his person was not authorized by the search warrant and was unlawful. "The government concedes the pat-down search by the troopers was beyond what is reasonable for such a pat-down search. Therefore, the government will not seek to introduce the methamphetamine seized from [Reisselman's] pants in its case-in-chief at trial." (Doc. No. 30, p. 5) Accordingly, Riesselman's motion to suppress should be granted as to the drugs seized from his person, and the drugs should be suppressed.

### B.     *Right to counsel*

This issue also can be disposed of easily. In Riesselman's motion, he indicates "he asked for a lawyer." (Doc. No. 28, ¶ 7) Riesselman testified he did not expressly ask for a lawyer, but instead asked if he should have a lawyer. According to him, he was told that he and the officers were "just talking," with the implication that a lawyer was not necessary at that time. The officers do not recall that this conversation ever occurred, but even if it did, the court finds Riesselman's question did not amount to "'a clear and unequivocal request for the assistance of counsel'" that was sufficient to invoke his sixth amendment right to counsel. *United States v. Cloud*, ___ F.3d ___, ___, 2010 WL 547041 at *3 (8th Cir. Feb. 18, 2010) (quoting *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003)).

## C. Failure to provide complete copy of search warrant

Riesselman argues all fruits of the search warrant should be suppressed because the officers failed to provide him with a complete copy of the warrant, including Attachment 1 which was incorporated into the warrant by reference. He relies on *Groh v. Ramirez*, 540 U.S. 551, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004), for his argument that the officers' failure to provide him with the complete search warrant justifies suppression of all fruits of the search.

In *Groh*, the Supreme Court held a warrant that did not describe, with particularity, the specific items to be seized was in violation of the Fourth Amendment, which the Court noted "states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized*.'" *Groh*, 540 U.S. at 557, 124 S. Ct. at 1289 (quoting U.S. Const. amend. IV; emphasis by the Court). *Groh* involved the search of a Montana ranch by ATF agents who were looking for illegal firearms and destructive devices. On the basis of an informant's tip, ATF Agent Groh prepared a thorough warrant application that identified the place to be searched and all the types of contraband officers wanted to seize. The warrant itself, however, did not incorporate by reference the itemized list of contraband that was included in the warrant application. The warrant identified the "person or property to be searched" as a "single dwelling residence two story in height which is blue in color and has two additions attached to the east. The front entrance to the residence faces in a southerly direction." *Groh*, 540 U.S. at 554 n.2, 124 S. Ct. at 1288 n.2.

When officers went to the ranch to execute the warrant, Agent Groh orally described the objects of the search to the rancher's wife, who was present at the scene, and by telephone to the rancher. The search yielded no illegal weapons or other contraband.

When the search was concluded, Agent Groh gave the rancher's wife a copy of the warrant itself, but not the application which contained a list of the contraband to be seized.

The rancher sued Agent Groh and other officers who had conducted the search alleging, *inter alia*, that his rights under the Fourth Amendment had been violated. The district court found no violation of the Fourth Amendment "because it considered the case comparable to one in which the warrant contained an inaccurate address, and in such a case, the court reasoned, the warrant is sufficiently detailed if the executing officers can locate the correct house." *Groh*, 540 U.S. at 555-56, 124 S. Ct. at 1289. The Ninth Circuit Court of Appeals reversed on the Fourth Amendment issue, holding the warrant was invalid because it failed to describe the place to be searched and items to be seized with particularity, and Agent Groh's oral statements to the rancher and his wife did not cure the omission. *See id.* (discussing *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1029-30 (9th Cir. 2002)). The Ninth Circuit noted that "'[t]he leaders of the search team must also make sure that a copy of the warrant is available to give to the person whose property is being searched at the commencement of the search, and that such copy has no missing pages or other obvious defects.'" *Id.* (quoting *Ramirez*, 298 F.3d at 1027).

The Supreme Court held that "[t]he warrant was plainly invalid[,]" because it "failed altogether" to describe with particularity the persons or things to be seized. *Groh*, 540 U.S. at 557, 124 S. Ct. at 1289. Further, the Court held as follows:

> The fact that the *application* adequately described the "things to be seized" does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents. *See Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984) ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional"); *see also United States v. Stefonek*, 179 F.3d 1030, 1033 ([7th Cir.] 1999) ("The Fourth Amendment requires that the *warrant* particularly describe the things to be seized, not the papers presented to the judicial

> officer . . . asked to issue the warrant"). And for good reason: "The presence of a search warrant serves a high function," *McDonald v. United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 93 L. Ed. 153 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection. We do not say that the Fourth Amendment forbids a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and **if the supporting document accompanies the warrant.** *See, e.g., United States v. McGrew*, 122 F.3d 847, 849-50 ([9th Cir.] 1997); *United States v. Williamson*, 1 F.3d 1134, 1136 n.1 ([10th Cir.] 1993); *United States v. Blakeney*, 942 F.2d 1001, 1025-1026 ([6th Cir.] 1991); *United States v. Maxwell*, 920 F.2d 1028, 1031 ([D.C. Cir.] 1990); *United States v. Curry*, 911 F.2d 72, 76-77 ([8th Cir.] 1990); *United States v. Roche*, 614 F.2d 6, 8 ([1st Cit.] 1980).

*Groh*, 540 U.S. at 557-58, 124 S. Ct. at 1289-90) (italicized emphasis by the Court; bold emphasis added).

In *Groh*, the warrant failed to incorporate other documents by reference, and neither the affidavit nor the warrant application accompanied the warrant. The Court noted that "unless the particular items described in the affidavit are also set forth in the warrant itself (***or at least incorporated by reference, and the affidavit present at the search***), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Groh*, 540 U.S. at 560, 124 S. Ct. at 1291 (emphasis added; citing *McDonald v. United States*, 335 U.S. at 455, 69 S. Ct. at 193).

The Supreme Court in *Groh* did not discuss its observation that a warrant may pass constitutional scrutiny if it incorporates another document by reference and the referenced

document is present at the scene during the search.  The Eighth Circuit, however, has considered the issue and ruled as follows:

> "The traditional rule is that the generality of a warrant cannot be cured by the specificity of the affidavit which supports it because, due to the fundamental distinction between the two, the affidavit is neither part of the warrant nor available for defining the scope of the warrant. . . .  However, where the affidavit is incorporated into the warrant, it has been held that the warrant may properly be construed with reference to the affidavit for purposes of sustaining the particularity of the premises to be searched . . ., *provided that a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein.*"

*United States v. Strand*, 761 F.2d 449, 453 (8th Cir. 1985) (quoting *United States v. Johnson*, 541 F.2d 1311, 1315 (8th Cir. 1976) (emphasis added).

In the present case, the court has found that the warrant properly incorporated Attachment 1 by reference, but the officers failed to provide Riesselman with a complete copy of the warrant that included Attachment 1, so he was never apprised sufficiently of the items to be seized.  The question, then, is how this failure affects the search itself.  Riesselman argues the officers' failure to provide him with a complete copy of the warrant "not only violated both the letter and the spirit of *Groh*, but also violated Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure."  (Doc. No. 28-1, p. 10)  The Rule requires an officer executing a search warrant to "give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property."  Fed. R. Crim. P. 41(f)(1)(C).  Riesselman argues violation of the Rule requires suppression of the fruits of the search, again relying on *Groh*, where the Supreme Court held, "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted.  [Footnote omitted.]  Because [Groh] did not have in his possession a warrant particularly describing the things he intended to seize,

11

proceeding with the search was clearly 'unreasonable' under the Fourth Amendment." *Groh*, 540 U.S. t 563, 124 S. Ct. at 1293; *see* Doc. No. 28-1, p. 9.

However, numerous courts, including the Eighth Circuit Court of Appeals, have held that this type of violation of Rule 41 does not mandate suppression unless "a defendant is prejudiced or if reckless disregard of proper procedure is evident." *United States v. Spencer*, 439 F.3d 905 (8th Cir. 2006) (citing *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994)); *see, e.g.*, *Unites States v. Gantt*, 194 F.3d 987, 993, 994 (9th Cir. 1999) (citing cases from the First, Fifth, Sixth, and Seventh Circuits). "Not all violations of this type of rule require the suppression of evidence; we have said that innocent mistakes that do not prejudice the defendant may be excused." *United States v. Zacher*, 465 F.3d 336, 339 (8th Cir. 2006) (citing *United States v. Schroeder*, 129 F.3d 439, 443-44 (8th Cir. 1997); *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1997)). Here, Jones had a complete copy of the warrant with him, including Attachment 1. Had Riesselman inquired about the absence of Attachment 1, and asked to see it, his request undoubtedly would have been granted, and Jones would have discovered his error in failing to provide Riesselman with a copy of Attachment 1.

There is no evidence that the officers' failure to give a copy of Attachment 1 to Riesselman was deliberate. Further, Riesselman has failed to show he was prejudiced. Therefore, Riesselman's motion to suppress the fruits of the search should be denied.

### D. Riesselman's statement

Riesselman argues his statement to the officers was motivated by the drugs that were seized illegally from his pocket, and "[h]is continued detention and interrogation was the direct result of the drugs found on his person." (Doc. No. 28-1, p. 10) Notably, when Riesselman testified at the hearing on his motion to suppress, he never stated, or even implied, either that the officers used the discovery of the drugs to induce him to make a

statement or that had the drugs not been found on his person, he would have declined to make a statement to the officers. The officers testified they planned to interview Riesselman in any event to see if he would give a statement and to inquire if he was willing to cooperate in a further investigation.

The court finds the officers' questioning was not motivated by the discovery of the drugs. However, whether Riesselman's willingness to talk with the officers was motivated by the illegal discovery of the drugs is not as clear. If his statement was motivated by the illegal discovery of the drugs, then absent intervening circumstances, his statement should be suppressed. The United States Supreme Court has explained the use of this "exclusionary rule" as follows:

> The suppression or exclusionary rule is a judicially prescribed remedial measure and as "with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620, 38 L. Ed. 2d 561 (1974). Under this Court's holdings, the exclusionary rules reaches not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 268, 84 L. Ed. 307 (1939). It "extends as well to the indirect as the direct products" of unconstitutional conduct. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963).
>
> Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was
>
> > "'come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable

> to be purged of the primary taint.'" *Id.*, at 488, 83 S. Ct., at 417 (citation omitted; emphasis added).
>
> It has been well established for more than 60 years that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is "so attenuated as to dissipate the taint," *Nardone v. United States*, *supra*, 308 U.S., at 341, 60 S. Ct., at 368.

*Segura v. United States*, 468 U.S. 796, 804-05, 104 S. Ct. 3380, 3385, 82 L. Ed. 599 (1984).

However, the *Segura* Court further explained that "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Id.*, 468 U.S. at 815, 104 S. Ct. at 3391 (quoting *United States v. Crews*, 445 U.S. 463, 471, 100 S. Ct. 1244, 1250, 63 L. Ed. 2d 537 (1980)); *accord United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008); *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007)..

In the present case, there is no evidence that Jones mentioned the seized drugs when he asked Riesselman if he was willing to talk with the officers. Jones read Riesselman his rights, Riesselman indicated he understood his rights, and then Riesselman indicated he was willing to talk to the officers. A few minutes later, Heideman took Reisselman indoors and again went over his rights with him in detail, asking him point-by-point if he understood his rights. Heideman also did not mentioned the seized drugs during his discussion with Riesselman about his rights. Riesselman again indicated he understood his rights and he was willing to talk with the officers.

The record is devoid of any evidence that had the drugs not been discovered, either the officers would not have sought to question Riesselman or he would have declined to make a statement. The Supreme Court has warned that "'[s]ophisticated argument may

prove a causal connection between information obtained through [illegal conduct] and the Government's proof,' . . . [but] the courts should consider whether '[a]s a matter of good sense . . . such connection may have become so attenuated as to dissipate the taint.'" *Segura*, 468 US. at 816, 104 S. Ct. at 3391 (quoting *Nardone*, 308 U.S. at 341, 60 S. Ct. at 268). Here, if there was evidence that the officers had used discovery of the drugs to persuade Riesselman to make a statement, or if Riesselman had testified that he was so fearful or otherwise swayed by emotion at the discovery of the drugs in his pocket that he was motivated to speak to the officers, then a different result might be warranted. On this record, however, the undersigned finds, as "a matter of good sense," that the exclusionary rule should not be extended to require suppression of Riesselman's statement. *Cf. id.* ("exclusionary rule . . . already exacts an enormous price from society and our system of justice," and should not be extended unnecessarily).

Despite the discovery of drugs in Riesselman's pocket, the record establishes that Riesselman's statement was given voluntarily. He was advised of his rights twice before he began giving his statement. His interview did not begin immediately when the drugs were discovered. He was interviewed in a comfortable location in his own residence. And the actions of the troopers who discovered the drugs were not flagrant. Although the troopers conducted a pat-down search of Riesselman for officer safety to ensure he was not carrying weapons, and the officers erred in emptying Riesselman's pockets, the court finds this conduct was not a deliberate or flagrant attempt to violate Riesselman's rights. The court therefore finds Riesselman's statement was given voluntarily, and it was not coerced or procured by means of exploitation of the illegal seizure of the drugs. *See Untied States v. Yockey*, 654 F. Supp. 2d 945, 958-59 (N.D. Iowa 2009). Accordingly, Riesselman's statement should not be suppressed.

## *CONCLUSION*

For the reasons discussed above, it is respectfully recommended that Riesselman's motion to suppress be **granted in part and denied in part**, as follows: the drugs found in Riesselman's pocket should be suppressed, but neither his statement nor any of the items found during the search of his residence should be suppressed.

Objections to this Report and Recommendation must be filed by **March 22, 2010**. Responses to objections must be filed by **March 26, 2010**.

**IMPORTANT NOTE:** Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but no later than **March 23, 2010**, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 16th day of March, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT