# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

PAUL RIESSELMAN,

Defendant.

No. CR09-4061-MWB

**AMENDED REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE**

_____

On January 28, 2010, the grand jury returned a Superseding Indictment against the defendant Paul Riesselman charging him in Count 1 with conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 960(a); in Count 2 with distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(C), and 860(a); in Count 3 with being an unlawful user of methamphetamine in possession of firearms in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); and in Count 4 with unlawfully possessing an unregistered sawed-off shotgun in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871.  (Doc. No. 18)  On March 1, 2010, Riesselman filed a motion to suppress evidence obtained and arising from a search of his residence and his person on July 9, 2008.  (Doc. No. 28)  The plaintiff (the "Government") filed a resistance to the motion.  (Doc. No. 30).

The Trial Management Order assigned motions to suppress to the undersigned for appropriate disposition.  (Doc. No. 7, § IV.A.)  The undersigned held a hearing on the motion on March 10, 2010, at which Assistant United States Attorney Kevin Fletcher appeared on behalf of the Government, and Riesselman appeared with his attorney Jim McGough.  The Government offered the testimony of Tri-State Drug Task Force Officer Darin J. Heideman, and Special Agent Todd Gordon Jones of the Iowa Division of

Narcotics Enforcement. Riesselman testified on his own behalf, and he also offered the testimony of his mother, Jane Pagel.

The following exhibits were admitted into evidence: **Gov't Ex. 1**, Search Warrant issued by the undersigned on July 3, 2008, with attached Return made before the undersigned on July 10, 2008, and four-page inventory of items seized during the search of Riesselman's residence (Doc. No. 30-1); **Gov't Ex. 2**, Attachment 1 to the search warrant (Doc. No. 30-2); **Gov't Ex. 3**, Application for Search Warrant (Doc. No. 30-3); **Gov't Ex. 4**, Affidavit of Darin Heideman in support of the application for search warrant (Doc. No. 30-4); **Gov't Ex. 5**, Iowa DNE Rights Advisory Form signed by Riesselman on July 9, 2008 (Doc. No. 30-5); **Gov't Ex. 6A**, a CD containing an audio recording of a portion of officers' interview of Riesselman on July 9, 2008; **Gov't Ex. 6B**, a transcript of the audio recording contained in Gov't Ex. 6A (Doc. No. 34); and **Gov't Ex. 7**, a copy of a photograph of Riesselman's cell phone and an inventory sheet left on Riesselman's kitchen table when officers had finished their search of the residence on July 9, 2008 (Doc. No. 35).

On March 16, 2010, the court filed a Report and Recommendation (Doc. No. 36), recommending that the motion to suppress be granted in part and denied in part. On March 18, 2010, Riesselman filed a motion to reopen the evidence, extend the deadline to file objections to the Report and Recommendation, and continue the trial of this case. (Doc. No. 37) The court granted the motion (Doc. No. 38), and scheduled a supplemental hearing, which was held on March 24, 2010. The only evidence offered at the hearing was additional testimony by Riesselman.

### BACKGROUND FACTS

The following background facts are taken from the Affidavit in support of the search warrant (Gov't Ex. 4), the testimony and exhibits admitted into evidence at the suppression

hearing, and the testimony of the defendant at the supplemental suppression hearing. In mid-March 2008, a confidential informant ("CI") met with SA Jones and provided information indicating the CI had purchased methamphetamine from Riesselman over a period of time. The CI stated Riesselman conducted drug transactions in the basement of his residence, and he had surveillance cameras and weapons at the residence. Over the next three to four months, the CI met with Riesselman at Riesselman's residence on numerous occasions during which the CI and Riesselman discussed methamphetamine transactions and weapons. On one occasion, the CI purchased a small quantity of metham-phetamine from Riesselman. The details of the encounters between the CI and Riesselman are set forth in the affidavit (Gov't Ex. 4). Among other things, the CI provided information that gang members had been seen at Riesselman's home, and Riesselman had acquired a .308 assault rifle.

Because SA Jones is not a federally-deputized officer, he asked TFO Heideman to assist him in obtaining a federal warrant to search Riesselman's residence. Heideman prepared an affidavit (Gov't Ex. 4) and application for search warrant (Gov't Ex. 3), and presented them to the undersigned on July 3, 2008. Based on the information contained in the affidavit, the undersigned found probable cause to issue the search warrant, and the warrant was issued. (Gov't Ex. 1) The search warrant form contains spaces for the court to designate whether a person, a designated premises, or both will be the subject of the search. The Government requested authority to search premises designated as Riesselman's residence, garage, "and any other outbuildings, garbage containers, and/or vehicles parked on the property[.]" (Gov't Ex. 1) The Government did not request, and the court did not authorize, the search of any persons. (*Id.*) In the space on the search warrant form for the designation of the items for which officers were authorized to search, the form indicates, "See attachment 1." (*Id.*) The court routinely permits warrants and affidavits to refer to attachments, and deems the warrant itself to include both the Search

Warrant form (Gov't Ex. 1) and the attachment (Gov't Ex. 2). *See United States v Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006) ("an affidavit may provide the necessary particularity for a warrant if it is either incorporated into or attached to the warrant") (internal quotation marks, citations omitted); *cf. United States v. Hamilton*, 591 F.3d 1017, 1028-29 (8th Cir. 2010). Attachment 1 lists numerous documents, items of drug paraphernalia, weapons, and other items for which officers were authorized to search pursuant to the warrant. (*See* Gov't Ex. 2)

On July 9, 2008, at about 9:00 a.m., Heideman met with Jones and a number of other officers in Crawford County, Iowa, for a briefing prior to execution of the search warrant. Heideman provided Jones with copies of the warrant, including Attachment 1, and Heideman's affidavit in support of the warrant application. Jones briefed the officers about the case, and a member of the Iowa State Patrol Tactical Unit gave the tactical side of the briefing. The Tactical Unit members were to conduct the entry into the residence while the non-tactical officers secured the perimeter and apprehended anyone who might attempt to flee from the premises. Jones assigned Heideman to interview Riesselman, but Jones also planned to question Riesselman himself. The officers intended to ask Riesselman about the activities detailed in the warrant affidavit, such as his drug usage, drug trafficking activities, association with gang members, and weapons. They also planned to see if Riesselman was interested in cooperating with law enforcement in a further investigation.

When the team arrived at Riesselman's residence, the Tactical Unit approached the house and set off two diversionary devices. They secured a female subject, Stephanie Adams, who was inside the residence. Some of the non-tactical officers encountered Riesselman and another individual, George Wayland, outside the rear of the residence. They secured and handcuffed Riesselman and Wayland. As Jones entered the area and walked toward Riesselman, one of the other officers approached Jones and told him a small

personal-use quantity of methamphetamine had been found in Riesselman's pocket during a pat-down search. Jones took possession of the drugs and approached Riesselman, who was sitting on the ground with his hands cuffed behind his back. Jones and Heideman both testified that before they learned drugs had been found on Riesselman's person, they had planned to interview him to see if he would give a statement and to inquire if he was willing to cooperate in a further investigation.

Jones read Riesselman his *Miranda* rights, and Riesselman indicated he understood his rights and was willing to talk with the officers. Jones directed Riesselman to "sit tight" for a minute, and then Jones asked Heideman to take Riesselman inside the residence and interview him while Jones talked with Wayland and Adams. Heideman took Riesselman inside and the two sat at the kitchen table. Riesselman testified that as they were walking into the residence, he asked, "Should I have an attorney present?" and Heideman said they were "just talking," and if Riesselman talked with him, then he could tell the prosecutor Riesselman had cooperated. Heideman has no memory of this conversation and made no notes about it in his written notes of the interview; however, he testified it was possible that the conversation occurred. Jones also has no memory of Riesselman ever asking for a lawyer at any time.

Although neither officer remembers what occurred with regard to Riesselman's handcuffs, either the handcuffs were removed or his hands were repositioned in front of him because he was able to write and use his hands while he was seated at the table. He was not formally placed under arrest, and there was no plan to arrest him that day, although he was detained while the search of the residence was conducted. Heideman produced a written Rights Advisory Form (Gov't Ex. 5), which he placed on the table in front of Riesselman. Heideman read each of the paragraphs on the form to Riesselman, and then indicated that if Riesselman understood his rights, he should initial the form next

to each of the paragraphs, and sign the form at the bottom. Riesselman executed the form at 9:25 a.m.

After Riesselman signed the form, Heideman reminded him that drugs had been found on his person a short time earlier, and then asked him when he had last used drugs. Riesselman responded that he had last used drugs that morning. Heideman asked if the drugs he had used had been out of the drugs found on his person, and Riesselman responded that they had been. Heideman then asked Riesselman about his drug usage and work history, and about some of the weapons that were in the residence. No one else was present with Heideman and Riesselman at the time the interview began. Heideman did not have a recording device with him, so the first part of the interview was not recorded. He talked with Riesselman for approximately thirty to forty-five minutes before Jones came in and joined them. Jones had a recording device with him, and the remainder of the interview, about an hour-and-a-half, was recorded. (*See* Gov't Exs. 6A & 6B) Jones asked Riesselman about his drug history, people he had bought drugs from and sold drugs to, financial transactions related to drug sales, and the like.

At the supplemental suppression hearing, Riesselman testified that shortly after Heideman advised him of his *Miranda* rights, Heideman told him they "already had him" because of the drugs they had found in his pocket, and if he would talk with the officers, they would talk to the prosecution about reducing his charges or making it easier on him. Riesselman testified that if the officers had not found the drugs on him, he would not have given them a statement. He testified he was sure of this because he knew there was nothing in his house to cause him concern.[1] He testified that he agreed to talk to the officers because he figured he was in trouble already because of the drugs they had found on his person. Riesselman also testified that the officers seized a cell phone from his

---

[1]During the search of the house, officers found packaging materials, a scale, and several weapons, but no drugs.

person when he was searched outside his house, and during questioning, Jones asked him about numbers stored on the cell phone.

Jones and Heideman finished questioning Riesselman at about 11:30 a.m., so they released him and he was allowed to leave the premises. Jones gave Riesselman a copy of the warrant (Gov't Ex. 1). Jones thinks there was more than one page to the document he gave to Riesselman, but he does not specifically recall if Attachment 1 was with the face page of the search warrant. Riesselman testified that all he was given was the first page of Gov't Ex. 1, the face page of the Search Warrant. He stated that when he left the residence, his mother was there, and he told her he did not understand what the officers were looking for. He noted that the search warrant referred to an "Attachment 1," but there was nothing attached to the page Jones had given him. Riesselman's mother also testified there was only one page to the document. The court finds Riesselman's and his mother's testimony to be credible on this issue, and therefore finds Riesselman only received the first page of the search warrant, and not Attachment 1.

When the officers finished the search and left the residence, Jones left Riesselman's cell phone and a copy of the inventory on the kitchen table. He photographed the items to show what had been left. (Gov't Ex. 7)

## DISCUSSION

Riesselman raises several issues in his motion. He argues the search of his person was not authorized by the search warrant and was unlawful. He claims his statement to the officers arose from the discovery of the drugs in his pocket that occurred during the illegal search of his person. He argues he asserted his right to counsel, yet the officers continued to question him. And he claims execution of the warrant was unlawful because the officers failed to give him a complete copy of the warrant that included a list of items

for which they were authorized to search. The court will address each of these issues below.

## A.    Search of Riesselman's person

Riesselman argues the search of his person was not authorized by the search warrant and was unlawful. In its brief, the government concedes this point. "The government concedes the pat-down search by the troopers was beyond what is reasonable for such a pat-down search. Therefore, the government will not seek to introduce the methamphetamine seized from [Riesselman's] pants in its case-in-chief at trial." (Doc. No. 30, p. 5) Accordingly, Riesselman's motion to suppress should be granted as to the drugs seized from his person, and the drugs should be suppressed.

The government does not concede that the cell phone was seized unlawfully. The seizure was not pursuant to a warrant, so the government has the burden of proving that the seizure was lawful. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *United States v. Hill*, 386 F.3d 855, 858 (8th Cir.2004). Because no evidence was offered on the circumstances surrounding the seizure of the cell phone, the court finds the seizure was unlawful and the phone should be suppressed.

The court will address, below, the issue of whether discussions regarding the illegally-seized drugs and cell phone during Riesselman's statement to the officers should be suppressed.

## B.    Right to counsel

In Riesselman's motion, he indicates "he asked for a lawyer." (Doc. No. 28, ¶ 7) Riesselman testified he did not expressly ask for a lawyer, but instead asked if he should have a lawyer. According to him, he was told that he and the officers were "just talking," with the implication that a lawyer was not necessary at that time. The officers do not

recall that this conversation ever occurred, but even if it did, the court finds Riesselman's question did not amount to "'a clear and unequivocal request for the assistance of counsel'" that was sufficient to invoke his sixth amendment right to counsel. *United States v. Cloud*, ___ F.3d ___, ___, 2010 WL 547041 at *3 (8th Cir. Feb. 18, 2010) (quoting *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003)).

## C.      *Failure to provide complete copy of search warrant*

Riesselman argues all fruits of the search warrant should be suppressed because the officers failed to provide him with a complete copy of the warrant, including Attachment 1 which was incorporated into the warrant by reference. He relies on *Groh v. Ramirez*, 540 U.S. 551, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004), for his argument that the officers' failure to provide him with the complete search warrant justifies suppression of all fruits of the search.

In *Groh*, the Supreme Court held a warrant that did not describe, with particularity, the specific items to be seized was in violation of the Fourth Amendment, which the Court noted "states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized*.'" *Groh*, 540 U.S. at 557, 124 S. Ct. at 1289 (quoting U.S. Const. amend. IV; emphasis by the Court). *Groh* involved the search of a Montana ranch by ATF agents who were looking for illegal firearms and destructive devices. On the basis of an informant's tip, ATF Agent Groh prepared a thorough warrant application that identified the place to be searched and all the types of contraband officers wanted to seize. The warrant itself, however, did not incorporate by reference the itemized list of contraband that was included in the warrant application. The warrant identified the "person or property to be searched" as a "single dwelling residence two story in height which is blue in color and has two additions attached to the east. The front entrance to the

residence faces in a southerly direction." *Groh*, 540 U.S. at 554 n.2, 124 S. Ct. at 1288 n.2.

When officers went to the ranch to execute the warrant, Agent Groh orally described the objects of the search to the rancher's wife, who was present at the scene, and by telephone to the rancher. The search yielded no illegal weapons or other contraband. When the search was concluded, Agent Groh gave the rancher's wife a copy of the warrant itself, but not the application which contained a list of the contraband to be seized.

The rancher sued Agent Groh and other officers who had conducted the search alleging, *inter alia*, that his rights under the Fourth Amendment had been violated. The district court found no violation of the Fourth Amendment "because it considered the case comparable to one in which the warrant contained an inaccurate address, and in such a case, the court reasoned, the warrant is sufficiently detailed if the executing officers can locate the correct house." *Groh*, 540 U.S. at 555-56, 124 S. Ct. at 1289. The Ninth Circuit Court of Appeals reversed on the Fourth Amendment issue, holding the warrant was invalid because it failed to describe the place to be searched and items to be seized with particularity, and Agent Groh's oral statements to the rancher and his wife did not cure the omission. *See id.* (discussing *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1029-30 (9th Cir. 2002)). The Ninth Circuit noted that "'[t]he leaders of the search team must also make sure that a copy of the warrant is available to give to the person whose property is being searched at the commencement of the search, and that such copy has no missing pages or other obvious defects.'" *Id.* (quoting *Ramirez*, 298 F.3d at 1027).

The Supreme Court held that "[t]he warrant was plainly invalid[,]" because it "failed altogether" to describe with particularity the persons or things to be seized. *Groh*, 540 U.S. at 557, 124 S. Ct. at 1289. Further, the Court held as follows:

> The fact that the *application* adequately described the "things to be seized" does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires

particularity in the warrant, not in the supporting documents. *See Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984) ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional"); *see also United States v. Stefonek*, 179 F.3d 1030, 1033 ([7th Cir.] 1999) ("The Fourth Amendment requires that the *warrant* particularly describe the things to be seized, not the papers presented to the judicial officer . . . asked to issue the warrant"). And for good reason: "The presence of a search warrant serves a high function," *McDonald v. United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 93 L. Ed. 153 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection. We do not say that the Fourth Amendment forbids a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and **if the supporting document accompanies the warrant.** *See, e.g., United States v. McGrew*, 122 F.3d 847, 849-50 ([9th Cir.] 1997); *United States v. Williamson*, 1 F.3d 1134, 1136 n.1 ([10th Cir.] 1993); *United States v. Blakeney*, 942 F.2d 1001, 1025-1026 ([6th Cir.] 1991); *United States v. Maxwell*, 920 F.2d 1028, 1031 ([D.C. Cir.] 1990); *United States v. Curry*, 911 F.2d 72, 76-77 ([8th Cir.] 1990); *United States v. Roche*, 614 F.2d 6, 8 ([1st Cit.] 1980).

*Groh*, 540 U.S. at 557-58, 124 S. Ct. at 1289-90) (italicized emphasis by the Court; bold emphasis added).

In *Groh*, the warrant failed to incorporate other documents by reference, and neither the affidavit nor the warrant application accompanied the warrant. The Court noted that "unless the particular items described in the affidavit are also set forth in the warrant itself (*or at least incorporated by reference, and the affidavit present at the search*), there can be no written assurance that the Magistrate actually found probable cause to search for,

and to seize, every item mentioned in the affidavit." *Groh*, 540 U.S. at 560, 124 S. Ct. at 1291 (citing *McDonald v. United States*, 335 U.S. at 455, 69 S. Ct. at 193) (emphasis added).

The Supreme Court in *Groh* did not discuss its observation that a warrant may pass constitutional scrutiny if it incorporates another document by reference and the referenced document is present at the scene during the search. The Eighth Circuit, however, has considered the issue and ruled as follows:

> "The traditional rule is that the generality of a warrant cannot be cured by the specificity of the affidavit which supports it because, due to the fundamental distinction between the two, the affidavit is neither part of the warrant nor available for defining the scope of the warrant. . . . However, where the affidavit is incorporated into the warrant, it has been held that the warrant may properly be construed with reference to the affidavit for purposes of sustaining the particularity of the premises to be searched . . ., *provided that a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein.*"

*United States v. Strand*, 761 F.2d 449, 453 (8th Cir. 1985) (quoting *United States v. Johnson*, 541 F.2d 1311, 1315 (8th Cir. 1976) (emphasis added).

In the present case, the court has found that the warrant properly incorporated Attachment 1 by reference, but the officers failed to provide Riesselman with a complete copy of the warrant that included Attachment 1, so he was never apprised sufficiently of the items to be seized. The question, then, is how this failure affects the search itself. Riesselman argues the officers' failure to provide him with a complete copy of the warrant "not only violated both the letter and the spirit of *Groh*, but also violated Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure." (Doc. No. 28-1, p. 10) The Rule requires an officer executing a search warrant to "give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the

property." Fed. R. Crim. P. 41(f)(1)(C). Riesselman argues violation of the Rule requires suppression of the fruits of the search, again relying on *Groh*, where the Supreme Court held, "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted. [Footnote omitted.] Because [Groh] did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment." *Groh*, 540 U.S. t 563, 124 S. Ct. at 1293; *see* Doc. No. 28-1, p. 9.

However, numerous courts, including the Eighth Circuit Court of Appeals, have held that this type of violation of Rule 41 does not mandate suppression unless "a defendant is prejudiced or if reckless disregard of proper procedure is evident." *United States v. Spencer*, 439 F.3d 905 (8th Cir. 2006) (citing *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994)); *see, e.g.*, *Unites States v. Gantt*, 194 F.3d 987, 993, 994 (9th Cir. 1999) (citing cases from the First, Fifth, Sixth, and Seventh Circuits). "Not all violations of this type of rule require the suppression of evidence; we have said that innocent mistakes that do not prejudice the defendant may be excused." *United States v. Zacher*, 465 F.3d 336, 339 (8th Cir. 2006) (citing *United States v. Schroeder*, 129 F.3d 439, 443-44 (8th Cir. 1997); *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1997)). Here, Jones had a complete copy of the warrant with him, including Attachment 1. Had Riesselman inquired about the absence of Attachment 1, and asked to see it, his request undoubtedly would have been granted, and Jones would have discovered his error in failing to provide Riesselman with a copy of Attachment 1.

There is no evidence that the officers' failure to give a copy of Attachment 1 to Riesselman was deliberate. Further, Riesselman has failed to show he was prejudiced. Therefore, Riesselman's motion to suppress the fruits of the search should be denied.

*D.*     *Riesselman's statement*

Riesselman claims the statement he gave to law enforcement "was the product of the illegal search of his person." (Doc. No. 28-1, p. 10) In its original Report and Recommendation, the court rejected this argument, noting that when Riesselman testified at the hearing on his motion to suppress, he never stated, or even implied, that if the drugs had not been found on his person, he would have declined to give a statement. Upon Riesselman's request, the court reopened the record, and Riesselman offered testimony that if the officers had not found drugs on his person, he would not have given the statement. He asserts that his statement was "the fruit of the poisonous tree." *Id.* (citing *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385, 82 L. Ed. 2d 599 (1984); *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

Any discussion of this subject must begin with *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). In *Wong Sun*, the Supreme Court held that verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search. *Wong Sun*, 371 U.S. at 485, 83 S.Ct. 407 ("the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects'"); *see United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.") (citing *Wong Sun*, 371 U.S. at 485, 83 S. Ct. 407).

The Supreme Court has explained this use of the "exclusionary rule" as follows:

> Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was

> "'come at by exploitation of [the initial] illegality
> or instead by means sufficiently distinguishable
> to be purged of the primary taint.'" [*Wong Sun
> v. United States*], 371 U.S. 471, [488], 83 S. Ct.
> 407[, 417, 9 L. Ed. 2d 441 (1963)] (citation
> omitted; emphasis added).
>
> It has been well established for more than 60 years that
> evidence is not to be excluded if the connection between the
> illegal police conduct and the discovery and seizure of the
> evidence is "so attenuated as to dissipate the taint," *Nardone
> v. United States*, *supra*, 308 U.S., at 341, 60 S. Ct., at 368.

*Segura v. United States*, 468 U.S. 796, 804-05, 104 S. Ct. 3380, 3385, 82 L. Ed. 599
(1984). "Suppression is not justified unless 'the challenged evidence is in some sense the
product of illegal governmental activity.'" *Id.*, 468 U.S. at 815, 104 S. Ct. at 3391
(quoting *United States v. Crews*, 445 U.S. 463, 471, 100 S. Ct. 1244, 1250, 63 L. Ed. 2d
537 (1980)); *see Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) (requiring a
causal link).

Evidence will not be suppressed as fruit of the poisonous tree under *Wong Sun*
unless the unlawful search is at least the "but for" cause of its discovery. *Hudson v.
Michigan*, 547 U.S. 586, 592, 126 S. Ct. 2159, 2164, 165 L. Ed. 2d 56 (2006); *accord
United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008); *United States v. Olivera-
Mendez*, 484 F.3d 505, 511 (8th Cir. 2007); *United States v. Marasco*, 487 F.3d 543, 547
(8th Cir. 2007) ("there is no reason to exclude evidence, however, if 'the police
misconduct is not even a "but-for" cause of [the] discovery' of the evidence.") (citing
*Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987) (en banc)). When invoking the *Wong
Sun* doctrine, the defendant has the burden of establishing a nexus between any illegality
and the challenged evidence. *Alderman v. United States*, 394 U.S. 165, 183, 89 S. Ct.
961, 22 L. Ed. 2d 176 (1969) (defendant must come forward with specific evidence

demonstrating that evidence is tainted to be entitled to suppression under fruit-of-the-poisonous-tree doctrine).

The suppression of a confession tainted by a prior Fourth Amendment violation is not automatic. The remaining question concerns whether the verbal statements resulted from "exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Brown v. Illinois*, 422 U.S. 590, 598-99, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). If a defendant establishes a "but for" relationship between evidence and prior illegality, the burden shifts to the Government to show that the connection between the evidence and the illegality is so attenuated as to dissipate the taint. *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008); *Yousif*, 308 F.3d at 830. The exclusionary rule will not apply if the Government can make this showing. *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). The confession may be admitted into evidence (assuming no *Miranda* violation) if it was voluntarily made, *see United States v. Lakoskey*, 462 F.3d 965, 974-75 (8th Cir. 2006), and there was a "sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation." *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *see Wong Sun*, 371 U.S. at 491, 83 S. Ct. at 419.

The court first will address whether Riesselman has met his burden of proving that he would not have given the statement "but for" the illegal search. Next, the court will address the question of whether the Government has met its burden of proving that the connection between the illegal search and Riesselman's statement is so attenuated as to dissipate the taint.

### 1. Causation

As David Hume noted, causation often is a complex and uncertain subject. *See* D. Hume, *"An Inquiry Concerning Human Understanding"* (1748). Here, the question of

causation can be viewed from at least two different perspectives. From the perspective of the law enforcement officers, the question is whether they would have interrogated Riesselman even if the drugs had not been found on him. From the perspective of Riesselman, the question is whether he would have decided not to give the statement if the drugs had not been found on him. From an analytical point of view, causation from both perspectives would be required to satisfy a "but for" test. This is because if causation from either perspective were not present, Riesselman presumably would not have given the statement.

From the officers' perspective, the question of causation is fairly straightforward. Jones and Heideman both testified that before they executed the search warrant, their plan was to ask Riesselman for a statement. They both testified they were not motivated to question Risselman by the discovery of drugs on his person because they already had decided to do so. The court credits this testimony. The court finds that when the officers decided to question Riesselman, they were not motivated by the discovery of the drugs.[2]

The question of whether Riesselman would not have given a statement "but for" the discovery of the drugs is a more difficult one. Riesselman testified at the supplemental suppression hearing that he would not have given a statement if the drugs had not been discovered. The court gives only limited weight to that testimony. When Riesselman testified at the supplemental suppression hearing, he may have believed he would have refused to give a statement if the drugs had not been discovered. However, he could not really know what he would have done under those circumstances. In hindsight, it probably would have been in Riesselman's best interests to refuse to give a statement, but this does not mean that is what he would have done. In the court's experience, a suspect in such a situation often will not act in accordance with his or her best interests. Furthermore, in

---

[2]Notably, although the officers knew that drugs had been found on Riesselman when they started to question him, they did not know that the search or the seizure of the drugs had been unlawful.

the present case, the officers had a great deal of additional information about Riesselman's alleged drug dealings. *See* Gov't Ex. 4. If the drugs had not been discovered, it is likely they would have used this information to persuade him to talk.

With regard to all but a few of Riesselman's statements to the officers, discussed below, the court finds Riesselman has not proved that he would not have talked to the officers if the drugs had not been discovered. This conclusion is supported by the fact that Riesselman did not make this assertion in his original suppression motion or in his testimony at the first suppression hearing. The defendant has the burden of establishing a nexus between any illegality and the challenged evidence. *Alderman v. United States*, 394 U.S. 165, 183, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969) (defendant must come forward with specific evidence demonstrating that evidence is tainted to be entitled to suppression under fruit-of-the-poisonous-tree doctrine). Because Riesselman has not met this burden, he cannot prevail on his motion to suppress his statement.

However, the illegal seizure of the drugs and cell phone obviously were the "but for" cause of the officers' questions to Riesselman concerning those items. The court therefore must determine whether Riesselman's statements concerning the illegally-seized drugs and cell phone were sufficiently attenuated to purge the taint.

### 2. *Attenuation*

Under *Brown*, to determine whether the Government has proved sufficient attenuation to dissipate the taint of a prior illegality, the court must address three specific factors: (1) the time elapsed between the illegality and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.*, 422 U.S. at 603-04, 95 S. Ct. at 2261-62; *see United State v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006). The question here is whether Riesselman's "statements were sufficiently acts of free will to be deemed voluntary, and whether those

statements are admissible notwithstanding the initial violation of [his] Fourth Amendment rights." *Yousif*, 308 F.3d at 832.

In *Mosby*, the Eighth Circuit Court of Appeals held that "attenuation analysis 'is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal government activity,'" and without that connection, "it [is] not necessary to apply the *Brown* factors." *Mosby*, 470 F.3d at 521 (citing *Hudson*, 547 U.S. at 592-93, 126 S. Ct. at 2164-65). This court has concluded that except for statements concerning the illegally-seized drugs and cell phone, the illegal search was not the "but for" cause of Riesselman's statement. Therefore, the attenuation analysis is required only as to the illegally-seized items. However, because this is a Report and Recommendation, the court will address the issue of attenuation as it affects the entirety of Riesselman's statement, to provide a thorough record for the reviewing judge. The ultimate question addressed by this analysis is whether the Government exploited the illegal search to obtain a statement from Riesselman, or instead, whether the Government obtained the statement by means sufficiently distinguishable from the illegality to purge the statement of the primary taint. *See Brown*, 422 U.S. at 598-99, 95 S. Ct. at 2259.

Riesselman claims the officers used the discovery of drugs on his person to persuade him to give a statement. In fact, the record establishes that Jones did not even mention the drugs when he asked Riesselman if he was willing to talk with the officers, and Riesselman readily agreed that he would.[3] A few minutes later, Heideman took Reisselman in the house and again went over Riesselman's rights with him, asking him point-by-point if he understood his rights. Again, Heideman did not mentioned the seized drugs during this discussion, and again Riesselman indicated he understood his rights and he was willing to

---

[3]At the supplemental suppression hearing, Riesselman testified that during his initial encounter with Jones, Jones did not make any statements to him or say anything to him about giving a statement or about cooperating. Riesselman did not mention this when he testified at the first suppression hearing. The court credits Jones's testimony describing his initial encounter with Riesselman.

talk with the officers. Heideman mentioned the discovery of the drugs only *after* Reisselman twice had agreed to speak with the officers.

The court now will apply the *Brown* analysis. The fact that the questioning began within a few minutes after the illegal seizure weighs against attenuation. *See United States v. Sheppard*, 901 F.2d 1230, 1239 (5th Cir. 1990) (King, J., dissenting)[4]; *Yousif*, 308 F.3d at 831 (where little time passed between an illegal traffic stop and a consent to search). There were some intervening circumstances that weigh in favor of attenuation. After the unlawful search, and before Riesselman made any incriminating statements, *Miranda* warnings were administrated to him by an officer other than the one who conducted the unlawful seizure. He then was moved from outside of his house to a kitchen table inside the house, where he was administered the *Miranda* warnings again. He was interviewed in a comfortable location in his own residence. He was questioned by officers other than the ones who conducted the unlawful search. The court finds these are significant circumstances that intervened between the illegal seizure and the questioning. Finally, the officers' conduct was not flagrant. The officers who questioned him were not in any way threatening or confrontational. Although they did exploit the fact that drugs were seized from him to encourage him to be forthcoming, this was after he had already agreed to talk. Furthermore, the officers who questioned Riesselman were not aware that the drugs had been seized illegally  The court finds these facts weigh in favor of attenuation. There was

---

[4]      The attenuation exception, however, requires greater temporal distance than seconds or minutes. Supreme Court decisions since *Wong Sun* have generally found that hours must elapse before evidence is purged of its taint. *Brown*, 422 U.S. at 604, 95 S. Ct. 2254 (statement separated from illegal arrest by less than two hours not attenuated); *Dunaway* [*v. New York*], 442 U.S. at 203, 218, 99 S. Ct. 2248 (incriminating statements made within an hour of illegal arrest not sufficiently attenuated); *Taylor v. Alabama*, 457 U.S. 687, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) (confession six hours after illegal arrest not purged of taint of illegal arrest).

no purposeful use of the illegality of the type that could be deterred by the suppression of the evidence. *See Brown*, 422 U.S. at 605, 95 S. Ct. at 2262.

The court therefore finds that the entirety of Riesselman's statement was given voluntarily, and it was not coerced or procured by exploitation of the illegal seizure of the drugs or cell phone. *See United States v. Yockey*, 654 F. Supp. 2d 945, 958-59 (N.D. Iowa 2009). Accordingly, no part of Riesselman's statement should be suppressed.

## CONCLUSION

For the reasons discussed above, it is respectfully recommended that Riesselman's motion to suppress be **granted in part and denied in part**, as follows: the drugs and cell phone found on Riesselman's person should be suppressed, but neither his statement nor any of the items found during the search of his residence should be suppressed.

Objections to this Report and Recommendation must be filed by **April 5, 2010**. Responses to objections must be filed by **April 9, 2010**.

**IMPORTANT NOTE:** Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but no later than **April 1, 2010**, underline regardless of whether the party believes a transcript is necessary to argue the objection. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 31st day of March, 2010.

_(signature)_

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT